UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LOUIS RODRIGUES,

    Plaintiff,

v.

SPECIAL TREATMENT UNIT, et al.,

    Defendants.

Civil Action No. 19-14708 (MCA)

MEMORANDUM OPINION

This matter has been opened to the Court by Defendant Dr. Merrill Main's filing of a motion to dismiss Plaintiff Louis Rodrigues' complaint for failure to state a claim for relief. (ECF No. 70.) For the reason stated in this Memorandum Opinion, the motion to dismiss is denied <u>without prejudice</u>.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

### a. Factual Background

The Court considers only the allegations relevant to Defendant Main. Plaintiff is an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4–27.24, et seq., and has filed a civil action arising from his conditions of confinement at the Special Treatment Unit ("STU"). Plaintiff was involuntarily committed on September 18, 2014, and was civilly committed on February 19, 2015. (ECF No. 1, Complaint at ¶¶ 35-36.) Plaintiff's Complaint asserts civil rights claims against Defendant Main and others related to his placement in the South Housing Unit and his status as Group Map and Treatment Refusal ("TR").

According to the Complaint, the STU has four housing units—East, West, North, and South, as well as dormitories at the Annex. (*Id.* at ¶ 85.) Each housing unit and the Annex have

1

rooms to conduct activities and social events. (*Id.*) The South Housing Unit consists of three floors, and the third floor is used to house residents whose status is Temporary Close Custody ("TCC"), Room MAP, Tier MAP, and/or Group MAP. (*Id.* at ¶ 86.) The first and second floors are used to house residents whose status is TR and Group MAP. (*Id.* at ¶ 87.) According to the Complaint, the STU also houses residents whose status is TR and Group MAP throughout the facility and not exclusively on the South Housing Unit. Plaintiff states that his status is GP/TR. (*Id.* at ¶ 89.)

On December 26, 2018, Defendant Sims, an Assistant Superintendent of the STU, issued a Memorandum notifying Sergeant Walker that Plaintiff was to be moved to the West Housing Unit. The very next day, Plaintiff was returned to the South Housing Unit. (*Id.* at ¶¶ 39-40.) Plaintiff asserts that he was returned to the South Housing Unit without explanation and at the direction of Defendants Main, Corniel, and Cheappetta. (*Id.* at ¶¶ 40-41.)

Plaintiff asserts that his continued placement in the South Housing Unit has resulted in the complete denial of religious services. (*See* Complaint at ¶¶ 59-67.) With respect to this claim, Plaintiff asserts that supervisory Defendants Main, Slaughter, Raupp, and Sims have instituted a policy preventing residents, including Plaintiff, from participating in religious services held in other locations of the STU. Although Defendants Slaughter, Raupp, and Sims, have maintained that a non-denominational chaplain regularly visits the South Housing Unit, Plaintiff asserts that for the past two years, a chaplain has visited only two or three times. (*Id.* at ¶ 63.) Plaintiff alleges that he informed Defendants Main, Slaughter, Sims, Raupp, and Collins

2

that his First Amendment rights were being violated, and these Defendants refused to rescind the decision denying Plaintiff's ability to participate in weekly services in the Annex. (*Id.* at ¶ 67.) Plaintiff also alleges that he exhausted several grievances with respect to this complete denial of religious services. (*See id.* at ¶¶ 65-66.)

Plaintiff also asserts that residents on the South Housing Unit are restricted from participating in social events, buying DVD movies and video games from source of sale vendors, and renting DVD movies and video games available from the STU. The social event restriction went into effect two years ago and was allegedly instituted by Defendants Main, the Clinical Director of the STU, and Simms, a program coordinator. On or about May 28, 2019, Plaintiff submitted a remedy form regarding the denial of social events, but no relief was provided. (ECF No. 1, Complaint at ¶¶ 68-72.) The policy restricting the purchase of DVDs and video games is unwritten and went into effect on May 15, 2019. It was allegedly instituted by Defendant Hunt, a staff member at the STU, and approved by Defendant Main. (*See id.* at ¶¶ 74-77.) On May 28, Plaintiff submitted a remedy form regarding this policy, but no relief was provided. (*Id.* at ¶ 78.)

On June 18, 2019, Defendant Hunt verbally notified South Housing Unit residents that they are not permitted to rent facility DVDs or video games. The policy was instituted by Defendant Hunt and approved by Defendant Main. Plaintiff asserts that this policy was instituted by Defendant Hunt due to remedy forms submitted by residents in response to the May 15, 2019 policy restricting the purchase of DVDs and video games. (*Id.* at ¶¶ 80-84.) According to the Complaint, other Housing units in the STU and the Annex are not affected by these policies despite the fact that the STU actively houses residents whose status is TR and Group Map throughout the facility and not exclusively on the South Housing Unit. (*Id.* at 88-89.)

3

### b. Procedural History

Plaintiff filed his Complaint on or about July 9, 2019. (ECF No. 1.) Based on his affidavit of indigence, the Court granted Plaintiff's application to proceed *in forma pauperis* ("IFP") and ordered the Clerk of the Court to file the Complaint. The Court then screened the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and proceeded the Complaint in part and dismissed it in part. As to Defendant Main, the Court proceeded the First Amendment religious exercise claim and the "class of one" equal protection claims regarding the alleged policies of denying social events and denying the purchase/rental of DVDs and video games.[1] (*See* ECF No. 4 at 15.)

On March 10, 2020, Plaintiff filed a Motion for Default Judgment against all Defendants. (ECF No. 13). Defendants Crystal Raupp and Marc Simms filed an Answer to the Complaint on May 29, 2020. (ECF No. 15). On September 28, 2020, the Magistrate Judge entered an Order denying without prejudice Plaintiff's motion for default judgment against the remaining Defendants. (ECF No. 31).

The Deputy Attorney General representing the other Defendants entered a notice of appearance on behalf of Defendant Main on February 28, 2022. (ECF No. 47). Plaintiff filed a letter requesting entry of default judgment against Defendant Main on April 20, 2022. (ECF No. 54). On April 25, 2022, Defendant Main sought an extension of time to respond to Plaintiff's Complaint. (ECF No. 57). On April 27, 2022, the Clerk entered default against Defendant Main for failure to plead or otherwise defend.

---

[1] With respect to Defendant Main, the Court also proceeded the claims for injunctive relief in connection with the religious exercise and "class of one" claims, and the NJCRA claims that are the state law analogs to the religious exercise and "class of one" claims.

On May 12, 2022, the Magistrate Judge entered an Order dismissing Plaintiff's motion seeking entry of default judgment against Defendant Main as premature and directing Defendant Main to file and serve a formal motion on or before May 23, 2022, for relief from the default entered against him by the Clerk and/or an extension of time to file a responsive pleading. (ECF No. 59).

On May 23, 2022, Defendant Main filed a Motion to Vacate the Clerk's Entry of Default and Extend Time to File a Responsive Pleading. (ECF No. 60). Plaintiff opposed Defendant Main's motion, and Defendant Main filed a reply. (*See* ECF Nos. 63, 64). On August 29, 2022, the Magistrate Judge entered an Order and Opinion granting Defendant Main's Motion to Vacate the Clerk's Entry of Default and Extend Time to File a Responsive Pleading. (ECF No. 66).

This motion to dismiss followed. (ECF No. 70.)

## II. STANDARD OF REVIEW

In resolving a motion to dismiss for failure to state a claim, under Rule 12(b)(6), "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Zimmerman v. Corbett*, 873 F.3d 414, 417–18 (3d Cir. 2017), *cert. denied* 138 S. Ct. 2623 (2018); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

As a pro se litigant, Plaintiff is entitled to liberal construction of his complaint. *See Liggon–Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011). To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)

(internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In resolving a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court can consider the allegations of the complaint as well as any "documents that are attached to or submitted with the complaint, ... any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (brackets in original). Where a document is "integral to or explicitly relied upon in the complaint," it "may be considered without converting the motion to dismiss into one for summary judgment" under Fed. R. Civ. P. 56. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) ("USciences") (quoting *Burlington*, 114 F.3d at 1426). But even where a document is integral to and explicitly relied upon in the [C]omplaint, "consideration [of that document] only goes so far." *Doe v. Princeton University*, 30 F.4th 33, 34 (3d Cir. 2022). Thus, when "the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Id.*

### III. DISCUSSION

Defendant Main argues that 1) he is entitled to qualified immunity because Plaintiff fails to plead any civil rights violations against him, and that 2) he is protected from liability under the professional judgment standard. (*See* Moving Brief at 8-16.) As explained below, neither of these arguments entitles him to dismissal of Plaintiff's First Amendment free exercise and "class

6

of one" equal protection claims. From the outset, Defendant Main relies on a 66-page document, titled "Residents' Guide to the STU, May 2, 2019" ("the Guide") to amplify and discredit Plaintiff's allegations. (*See* Exhibit A to Movant's Brief.) The Guide is not relied on in the Complaint or integral to the allegations, and the Court declines to consider this document as evidence at the motion to dismiss stage.[2]

Defendant Main frames his request for dismissal through the lens of qualified immunity. An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a two-pronged inquiry for use in analyzing the defense of qualified immunity. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). The first prong concerns whether the conduct at issue violated a federal right. *See id.* "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 656. Courts may use their discretion in deciding which of the two prongs of the qualified immunity they should tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. *See id.* at 244-45

---

[2] For instance, Defendant Main states that the "the denial or restriction of privileges previously granted to residents is based on that resident's behavior, regardless of the unit on which they are housed." (ECF No. 70-1, Moving Brief at 10 (citing McNally Cert., Exhibit A at p. 47).) As should be clear from the motion to dismiss standard, the Court is not able to consider this evidence at the pleading stage.

7

With respect to qualified immunity, Defendant Main argues that Plaintiff has not adequately pleaded that Main's conduct violated Plaintiff's constitutional rights.[3] The qualified immunity analysis under prong one mirrors the motion to dismiss standard under Rule 12(b)(6). *See, e.g., Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022) (explaining that in qualified immunity cases at the motion to dismiss stage, the court "accept[s] the plaintiff's allegations as true and draw[s] all inferences in his favor") (citations omitted).

The Court thus analyzes whether Plaintiff states a First Amendment religious exercise claim and a "class of one" equal protection claims against Defendant Main.[4] As a general matter, "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Indeed, civil detainees enjoy constitutional protection under the Fourteenth Amendment's Due Process Clause—not the Eighth Amendment, which analogously protects prisoners—from state facilities' imposition of restrictions and other general conditions of confinement that do not reasonably serve a

---

[3] Defendant Main does not argue or attempt to analyze whether the rights at issue are clearly established, and the Court does not consider the second prong of the qualified immunity analysis in the absence of briefing on the issue.

[4] Defendant Main does not contend that Plaintiff fails to sufficiently allege his personal involvement as a supervisor. Supervisor liability may attach if the supervisor(s), "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014) (reversed on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015)) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Alternatively, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 856.

legitimate, non-punitive government objective. *See Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979) (discussing rights of pretrial criminal detainees).

Institutional authorities nevertheless may restrict the constitutional freedoms that institutionalized persons otherwise would enjoy, so long as those restrictions are rationally related to a legitimate and neutral governmental objective. *See Turner v. Safley*, 482 U.S. 78, 87, (1987). This reasonableness standard applies even if the violation of a fundamental right is alleged, *see id.*, or if the conduct at issue is a central tenet of an inmate's religious beliefs. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). In order to determine if a regulation is reasonable, the court examines: 1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; 2) whether alternative means of exercising a right remain available; 3) the impact of the regulation on prison staff, other inmates, and prison resources; and the 4) availability of ready alternatives to the regulation. *See Turner*, 482 U.S. at 89-91. While a court may sometimes be in a position to apply the *Turner* factors based on the pleadings alone, often a factual record is necessary to assess whether the regulation or practice is reasonably related to legitimate penological interests. *See Ramirez v. Pugh*, 379 F.3d 122, 126–30 (3d Cir. 2004) (reversing grant of a motion to dismiss and remanding for development of the factual record); *see also Brothers v. Lawrence Cnty. Prison Bd.*, No. CIV.A. 06-1285, 2008 WL 146828, at *5 & n.7 (W.D. Pa. Jan. 14, 2008) ("[S]uch a multi-factored fact-intensive test as *Turner's* does not generally lend itself to being addressed in the context of a motion to dismiss....").

Here, Plaintiff alleges that Defendants Main and others have completely denied him access to religious services due to his housing assignment at the STU and/or status as a treatment refuser and also alleges that he has not been provided an alternative to religious services, such as

9

regular visits from a chaplain. The Court is not able to assess the *Turner* factors and determine whether this restriction is rationally related to legitimate penological interests without a more developed factual record. As such, Defendant Main's arguments that this restriction is legitimate and treatment-related must await a complete record at summary judgment. *See, e.g., Robinson v. Wetzel*, 648 F. App'x. 168, 171 (3d Cir. 2016) (affirming district court's grant of summary judgment where prisoner alleging denial of religious television programing had alternative means of exercising his First Amendment right to practice his Christian religion); *Houseknecht v. Doe*, 653 F.Supp.2d 547, 559 (E.D. Pa., 2009) (holding at the summary judgment stage that the restriction of the plaintiff's religious rights due to his election to enter into protective custody is rationally related to a legitimate penological interest). Because the Court cannot consider documents and evidence outside the Complaint and/or credit Defendant Main's contentions in his moving brief that he acted within his professional judgment in his all dealings with Plaintiff, the motion to dismiss the First Amendment claim as to Defendant Main is denied <u>without prejudice</u>. Qualified immunity is likewise denied <u>without prejudice</u> on prong one.

The Court also denies Defendant Main's motion to dismiss Plaintiff's "class of one" equal protection claim. An equal protection claim may be asserted by a "class of one where the plaintiff alleges that she has been intentionally treated differently from other similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quotations omitted); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (same).

Here, Plaintiff alleges that he is a resident of the South Housing Unit, and Defendant Main approved a policy barring residents of the South Housing Unit on TR status from participating in social events, buying DVD movies and video games from source of sale vendors,

10

and renting DVD movies and videos. He alleges that other SVPs who are on TR or similar restricted status and housed outside the South Housing Unit are not barred from social events and buying or renting DVDs and videos, despite their TR status. Defendant Main relies on evidence outside the Complaint and contends that these types of privileges are based on the individual behavior of each detainees and not on housing status; however, his contentions contradict the Complaint, and the Court must decide a motion to dismiss based on the allegations in the Complaint. Therefore, the Court denies <u>without prejudice</u> the motion to dismiss the class of one equal protection claim. Qualified immunity on prong one is likewise denied <u>without prejudice</u>.

With respect to both types of claims, Defendant Main also contends that his actions are entitled to a presumption of validity under the professional judgment standard. The Court agrees that <u>treatment decisions</u> by mental health professionals in connection with civilly committed individuals are controlled by the professional judgment standard. *See Youngberg*, 457 U.S. at 321–24. Under this standard, "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made," rather, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised." *Youngberg*, 457 U.S. at 321. "Liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

Defendant Main appears to rely on the Third Circuit's decision in *Oliver v. Roquet*, 858 F.3d 180 (2017) for the proposition that he is protected from liability for his "treatment decisions" regardless of whether his actions impinge on Plaintiff's First Amendment right to free exercise or violate his right to equal protection. In *Oliver*, the plaintiff, also an SVP, was denied

11

advancement to the next phase of sex offender treatment, and he sued a psychologist at the STU for allegedly retaliating against him for his own legal activities and his legal activities on behalf of other residents. The primary facts in support of the First Amendment retaliation claim were contained in a report, which, among other things, suggested that the plaintiff may need to consider whether his focus on legal activities was interfering with his treatment. *See id.* at 185-86. In its decision, the Third Circuit clarified the pleading requirements for a First Amendment retaliation claim against a mental health professional at a state institution,[5] holding that "a prima facie showing of causation requires more than the allegation that the professional based a medical decision on symptomology that happened to relate in some way to a patient's protected activity." Instead, there must be particular facts alleged that allow the court to reasonably infer it is the protected activity itself, and not simply medically relevant behavior associated with that activity, that formed the basis of the defendant's adverse action." *Id.* at 192. Thus, after *Oliver*, to state a First Amendment retaliation claim against a medical professional based on treatment decisions that seem to target or affect a protected activity, a Plaintiff must provide facts showing that the medical professional targeted the protected speech itself and not just the legitimate clinical or collateral consequences of that speech.

As explained by the Third Circuit,

> "[t]his is so because a medical professional's holistic approach to diagnosing a patient's mental health will sometimes require consideration of his otherwise protected speech and conduct to evaluate any adverse consequences they are having on his treatment. Framed in terms of the *Rauser* test and the relevant pleading standards, an assertion by a mental health detainee that

---

[5] To state a First Amendment retaliation claim in the usual course, an individual must assert that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

> his treating psychologist retaliated against him, based only on the factual allegation that the psychologist considered the effect his First Amendment activity was having on his treatment, would not support the inference that retaliation was the "substantial or motivating factor" for the psychologist's recommendation.

*Oliver*, 858 F.3d at 192.

Here, however, the Court did <u>not</u> proceed a First Amendment <u>retaliation</u> claim against Defendant Main based on his treatment decisions that incidentally affected Plaintiff's First Amendment activities. The First Amendment claim alleged in the Complaint is the denial of religious exercise, and there is nothing in the Complaint to suggest that Defendant Main restricted Plaintiff's access to religious services for treatment-related reasons. Plaintiff has also alleged that Defendant Main created a policy barring Plaintiff (and other SVPs in the South Unit) from participating in social events and buying and renting videos and video games and treated him differently than other similarly situated sex offenders who are permitted to have these privileges despite their status as treatment refusers. Whether these disparities are treatment-related and/or justified is not apparent from the Complaint, and Defendant Main cannot insulate himself from liability at the motion to dismiss stage merely by claiming to have acted in accordance with his professional judgment. For these reasons, the motion to dismiss and request for qualified immunity are also denied <u>without prejudice</u>.

## IV. <u>CONCLUSION</u>

For the reasons explained in this Memorandum Opinion, the motion to dismiss is denied <u>without prejudice</u> as to Merrill Main on Plaintiff's First Amendment religious exercise and "class of one" equal protection claims. Qualified immunity on prong one is likewise denied <u>without prejudice</u> as to both claims. Once discovery is complete, Defendant Main may move for summary judgment and qualified immunity on these claims, if appropriate. An appropriate order follows.

13

_____
Madeline Cox Arleo, District Judge
United States District Court

3-31-23

14