UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUIS RODRIGUES,<br><br>Plaintiff,<br><br>v.<br><br>SPECIAL TREATMENT UNIT, et al.,<br><br>Defendants. | Civil Action No. 19-14708 (MCA)<br><br>MEMORANDUM & ORDER |

This matter comes before the Court on a motion for summary judgment brought by retired STU director Merrill Main (ECF No. 183) and a motion for summary judgment brought by Department of Corrections administrators Crystal Raupp and Marc Sims. ("DOC Defendants"). (ECF No. 182.) Prior to ruling on the motions for summary judgment, the Court will require the parties to supplemental their Statement of Material Facts, legal arguments, and evidence regarding Plaintiff Louis Rodrigues' religious exercise claim, which he raises under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"). The Court will also provide Plaintiff the opportunity to respond to the supplemental briefing and will administratively terminate this matter and the motions for summary judgment pending the completion of the supplemental briefing.

Plaintiff filed his Complaint on or about July 9, 2019. (ECF No. 1.) Based on his affidavit of indigence, the Court granted Plaintiff's application to proceed *in forma pauperis* ("IFP") and ordered the Clerk of the Court to file the Complaint. The Court then screened the Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and proceeded the Complaint in part and dismissed it in part. As to the moving Defendants, the Court proceeded the First Amendment religious exercise claim regarding the denial of religious services and a "class of one" equal protection claims

regarding the alleged policies of denying social events and denying the purchase/rental of DVDs and video games. (*See* ECF No. 4 at 15.)

Plaintiff is involuntarily committed pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4–27.24, et seq., and resides at the Special Treatment Unit ("STU"). His Complaint alleges, among other things, that he has been denied access to religious services due his placement in the South Housing Unit and his status as Group Map and Treatment Refusal ("TR"). (*See generally*, ECF No. 1, Complaint.)

The record reflects that there are five housing units that make up the STU—North, South, East, West, and the Annex—and that Plaintiff was initially housed in the East Unit. (183-5, Exhibit B, 2019 STU Handbook at 43; ECF No. 183-9, Pl. Aug. 24 2023 Dep. at 28:2-9.) Plaintiff testified that he would attend weekly Christian church services in the Annex on Saturdays and Sundays. (*Id.* at 21:3-11.) The record also reflects that Plaintiff is a Christian and has sincerely-held religious beliefs, which include regularly attending church services. (*See* Pl. May 24, 2022 Dep. at 58:16-59:6.) In 2016, Plaintiff was transferred to the South Unit and placed on Treatment Refusal or "TR" status. (Pl. Aug. 24, 2023 Dep. at 28:10-17.) At the time of his second deposition in August 2023, Plaintiff was still housed in the South Unit and was still on TR status. (*Id.* at 29:10-12.)

It is undisputed that Plaintiff and other residents of the South Unit are not permitted to attend religious services, which are held in the Annex, and are available to residents in the general population. (*See* Main SUMF ¶ 39; DOC SUMF at ¶¶ 22-23.) It is not clear when this change took effect. The current summary judgment record reveals disputes over why Treatment Refusers in the South Unit are not permitted to attend religious services in the Annex and whether religious services are regularly available to residents in the South Unit.

In their summary judgment motion, both Main and the DOC Defendants contend that residents in the South Unit are not permitted to attend religious services in the Annex for security reasons unrelated to their TR status.[1] *See* DOC SUMF ¶¶ 23-24; Main SUMF 38). The DOC Defendants rely on Defendant Raupp's certification for the proposition that residents of the STU are not permitted to attend religious services due to security concerns. (*See* DOC SUMF § 39 (citing Raupp Cert. ¶ 8).) Main and the DOC Defendants also rely on Plaintiff's deposition to support this rationale (*see id.*), but, as the DOC Defendants acknowledge, Plaintiff testified that purported security concerns are unfounded due to security cameras and search procedures. (*See* Pl. May 24, 2022 Dep at 57:3-24.) Plaintiff also testified that STU residents in "lock up" are located on the third floor of the South Unit, that treatment refusers are located on the first and second floors, and that treatment refusers do not interact with residents in "lock up" on the third floor. (*Id.* at 22:13-20, 40:23-25.)

In addition, the record suggests that residents on TR status in the South Unit are not permitted to attend religious services in the Annex for a different reason—to encourage them to participate in sex offender treatment. It appears undisputed that treatment refusers are denied certain privileges (such as video games and social events) to encourage them to participate in sex offender treatment, but it is not clear if access to religious services (or other forms of religious exercise) is included among these privileges. According to Plaintiff, religious services are a type of "programming" and the STU handbook states that residents on the South Unit do not have access to most programming. (*Id.* at 47:20-48:5.) The parties appear to agree that religious rights

---

[1] Defendant Main also cites to the portion of the 2019 STU Inmate Handbook, which acknowledges "[t]he right to freedom of religious affiliation and voluntary religious worship" but notes that "reasonable restrictions based upon the safe, secure, orderly operation of the facility may be imposed." (Main SUMF ¶ 34 (citing 2019 STU Handbook at 55).)

are provided by the DOC and not the DHS, which is responsible for residents' treatment. Plaintiff, however, testified that Defendant Main ordered that treatment refusers in the South Unit could not participate in any activities, including religious services. (Pl. Aug. 24, 2023 Dep at 22:15-23:17; 46:17-48:5.) Plaintiff also testified that Defendant Raupp knew there were no religious services in the South Unit but did not intervene to remedy the situation. For instance, Plaintiff testifies that when he told Defendant Raupp about the lack of religious services in the South Unit, she told him: "well, if you want to go to the church, you've got to get out of the South Unit." (Pl. May 24, 2022 Dep. at 53:7-9.)

The parties also dispute whether separate religious services regularly occur in the South Unit. In moving for summary judgment, the DOC Defendants rely again on Defendant Raupp's certification, in which she avers that the DOC provides religious services in the South Unit and that a DOC Chaplain will tour the South Unit and hold religious services for anyone who wants to participate. (DOC SUMF § 38 (citing Raupp Certification at ¶ 7).)

Defendants also cite to Plaintiff's deposition testimony to support their claim that separate religious services are provided in the South Unit, but they mischaracterize his testimony.[2] Indeed, Plaintiff testified that there are essentially <u>no religious services</u> on the South Unit:

---

[2] For example, Plaintiff's testimony cited by Main in his SUMF does not support his contention that separate religious services regularly occur in the South Unit. Main cites to the following exchange:
> Q. So they didn't stop you from going to have a religious service, but they said you couldn't go to the Annex?
> A. To the Annex, yeah. Anyway, that happened to us, because the religious service is at the Annex.

(Pl. May 24, 2022 Dep. at 31:20-25.) Plaintiff's full response does not indicate that there are separate services in the South Unit. Instead, it appears to indicate that the Annex is the only location where religious services occur. The second portion of deposition testimony cited by Main also does not support his contention that separate services occur in the South Unit. In that

> Q. You receive religious services on the South Housing Unit, correct?
>
> A. No.
>
> Q. You don't receive any religious services?
>
> A. None.

(Pl. May 24, 2022 Dep at 21:17-22; *id.* at 45:10-16.)

Plaintiff testified that the Chaplain initially came to the South Unit therapy room for religious services (or bible study), but the visits stopped completely after three or four weeks, and the Chaplain no longer held any type of service (or bible study) in the South Unit:

> Q. So there are supposed to be someone that comes regularly. You're saying that person does not come regularly?
>
> A. I think three or four times.
>
> Q. When you say three or four times a week?
>
> A. Yeah, like three or four -- like three weeks in a row. She come one time. I think it was a Sunday night.
>
> Q. Okay. So she was coming every Sunday, every week?
>
> A. <u>Yeah, but for three weeks and that was it. After that, we don't see her no more.</u>
>
> Q. Okay. And how did you not see her? Did you not go to the services?
>
> A. No, because they were doing the therapy -- I mean, they were doing the religious inside the South room.
>
> Q. Okay. So my question is every Sunday when she was there, how did you know she wasn't going? Did you go every Sunday to check to see if

---

testimony, Plaintiff states that Main told him "if I want to go to church with the population, I've got to get out of South Unit." (Id. at 35:5-7.)

          she was there?

A.     Yeah, she came and gave us like little school or church, study the bible, and then she stopped coming. I don't know why.

Q.     How do you know she stopped coming? Did you go every week to see if she was there?

A.     No, I am in the South Unit. I am allowed in the South Unit.

Q.     Okay. So where did she have the religion services?

A.     She had the religion service in the therapy room.

Q.     Okay.

A.     Of the South Unit.

Q.     Did you go to the therapy room ever week to see if she was there?

A.     No. We used to go there. We did the religion in the South Unit for like three weeks. After that, did you go every week to see if she was there and she wasn't there? Is that what you're saying? I am trying to understand.

A.     The South Unit is a unit. The therapy room. She used to come to the South Unit to visit us and give us a bible study.

Q.     Okay.

A.     We can't go out of the South Unit.

Q.     Was there an announcement that she was there? How did you know she was there?

A.     Because she come in and see us, and she give an announcement to the officer, you know, religion service at therapy room.

> Q. <u>Gotcha. Okay. And after three weeks, they no longer made that announcement?</u>
>
> A. <u>No, because she wasn't show up.</u>
>
> Q. Okay.
>
> A. <u>She would not show up anymore.</u> I don't know why. Listen, I think -- this is what I think. Because we are in the South Unit, they are trying to say we are the worst people of the whole facility, of the whole place.

(*Id.* at 45:13-47:24 (emphasis added).) Thus, Plaintiff testified that the Chaplain came to the South Unit for religious services three or four times but subsequently stopped coming for religious services. Plaintiff also testified that he made a request to see the Chaplain for an appointment and was able to see her twice, but he could not continue to see her for appointments because she stopped coming to the South Unit altogether; he further testified that no other alternatives or options were provided. (*See id.* at 53:13-55:21.) Later in his deposition, Plaintiff reiterated that "They don't give a religious service no more in the South Unit" and appears to testify that residents in the South Unit can only speak to the Chaplain upon request. (*Id.* at 64:21-67:5.)

Thus, Defendants' claim that separate religious services are provided in the South Unit conflicts with Plaintiff's deposition testimony on this issue, which suggests at best, that residents of the South Unit had access to religious services for approximately a month before it was discontinued when the Chaplain stopped coming to the South Unit. Plaintiff also appears to testify that he requested to meet with the Chaplain several times, but this also ended when the Chaplain stopped coming. There is no evidence other than Defendant Raupp's conclusory Certification to show that separate religious services occur regularly in the South Unit or that adequate alternative means to exercise his religious beliefs were available to Plaintiff during the relevant time period.

"Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982). Civil detainees enjoy constitutional protection under the Fourteenth Amendment's Due Process Clause—not the Eighth Amendment, which analogously protects prisoners—from state facilities' imposition of restrictions and other general conditions of confinement that do not reasonably serve a legitimate, non-punitive government objective. *See Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979) (discussing rights of pretrial criminal detainees).

Institutional authorities nevertheless may restrict the constitutional freedoms that institutionalized persons otherwise would enjoy, so long as those restrictions are rationally related to a legitimate and neutral governmental objective. *See Turner v. Safley*, 482 U.S. 78, 87, (1987). This reasonableness standard applies even if the violation of a fundamental right is alleged, *see id.*, or if the conduct at issue is a central tenet of an inmate's religious beliefs. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). In order to determine if a regulation is reasonable, the court examines: 1) whether there is a valid, rational connection between the regulation and the asserted governmental interest; 2) whether alternative means of exercising a right remain available; 3) the impact of the regulation on prison staff, other inmates, and prison resources; and the 4) availability of ready alternatives to the regulation. *See Turner*, 482 U.S. at 89-91. A developed factual record is typically necessary to assess whether the regulation or practice is reasonably related to legitimate penological interests. *See Ramirez v. Pugh*, 379 F.3d 122, 126–30 (3d Cir. 2004) (reversing grant of a motion to dismiss and remanding for development of the factual record).

As the Third Circuit has observed, *Turner* did not expressly state which party bears the burden of proving each of these four factors. *Sharp v. Johnson*, 669 F.3d 144, 156 (3d Cir. 2012). Thus, the Third Circuit has developed a two-step, burden-shifting analysis under *Turner*:

> First, the prison has the burden of demonstrating the First *Turner* Factor. This burden is slight, and in certain instances, the connection may be a matter of common sense. Second, if the prison meets its burden under the First *Turner* Factor, then we consider the [Second, Third, and Fourth] *Turner* Factors.

*Sharp*, 669 F.3d at 156. Thus, although the prisoner-plaintiff bears the "ultimate burden of persuasion with regard to the reasonableness of a regulation," the prison is first required to "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could rationally have seen a connection between the policy and that interest." *Id.* at 156 (quoting *Jones v. Brown*, 461 F.3d 353, 360–61 (3d Cir. 2006) (alterations omitted)).

Based on their view of the evidence, the DOC Defendants apply the *Turner* factors and argue that they are entitled to summary judgment because residents in the South Unit may not attend religious services in the Annex for valid penological reasons and that separate religious services are provided in the South Unit. (*See* ECF No. 182-1 at 11-12.) In their qualified immunity arguments, the DOC Defendants frame the right at issue as the right to go to the Annex for group religious services. (*See id.* at 21 ("Here, no law clearly establishes that the Defendants' restriction of access to a specific location for religious services violated the free exercise clause of the Frist [sic] Amendment."); *see also id.* at 23-24 ("Specifically, there is no clearly established precedent that a resident in STU who is not prohibited or restricted from religious worship but is denied access to a particular location, due to safety and security concerns, is a violation of Plaintiff's rights.").) Similarly, Defendant Main also contends that residents in the South Unit have separate religious services and cites to the portion of the 2019 STU handbook which indicates that residents of the South Unit have separate programming. (Main SUMF ¶ 36 (citing STU Handbook at 42.)

Defendant Main argues that Plaintiff is simply unable to worship in his preferred location. (ECF No. 183-1, Main Moving Brief at 7.)

The Court, however, must view the evidence in the light most favorable to Plaintiff and finds that it is unable to resolve his religious exercise claim on the record provided. At this time, the Court directs Main and the DOC defendants to supplement their statement of material facts and legal arguments to reflect the evidence before the Court and provide additional evidentiary support for their arguments to the extent that evidence exists.

1. First, to the extent Defendants argue that residents on TR status in the South Unit are excluded from religious services in the Annex for legitimate security reasons, they should provide additional supporting evidence on this issue.

2. Second, Defendant Main should address whether treatment refusers are excluded from religious services in the Annex to encourage them to engage in sexual offender treatment, and, if so, he should address whether he is entitled to summary judgment under the professional judgment standard. The DOC Defendants should address whether Defendant Raupp and/or Defendant Simms are entitled to summary judgment as supervisors under the deliberate indifference standard.[3]

3. Third, to the extent Defendants still contend that separate religious services were offered or occurred on a consistent basis in the South Unit during the relevant time periods, they

---

[3] Supervisor liability may attach if the supervisor(s), "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014) (reversed on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015)) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Alternatively, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 856.

should provide the Court with documentary or other evidence showing that separate religious services were available to residents in the South Unit on a consistent basis during the relevant time periods.  In addition or in the alternative, Defendants are also free to argue that Plaintiff had other means to exercise his religion, but they must provide evidence showing what alternative means were actually available to residents in the South Unit and must analyze whether these alternative satisfy Plaintiff's First Amendment right to free exercise.

4. Fourth, to the extent Defendant Main or the DOC defendants seek qualified immunity, they must provide more than legal boilerplate and general claims that there are no relevant cases on point.  Instead, Defendants must view the evidence in the light most favorable to Plaintiff, provide the Court with relevant decisions in the area of religious exercise (including those involving prisoners), and distinguish those decisions from the case at hand.

5. And fifth, the Court will require supplemental briefing regarding Plaintiff's claim for injunctive relief in connection with his free exercise claim.  Defendants should specifically address who can provide injunctive relief with respect to Plaintiff's religious exercise claim, the relief that is warranted, if any, and whether the new STU director (or another individual) should be substituted as a Defendant given Defendant Main's retirement.[4]

---

[4] In his reply brief, Defendant Main states that this Court "curiously" proceeded claims for injunctive relief against him related to Plaintiff's visitation claim, though Plaintiff asserted the damages claims for this alleged violation against different Defendants. The Court proceeded the claims for injunctive relief against Defendant Main because he, as the then-STU director, could potentially provide the injunctive relief Plaintiff requested even if he was not personally involved in denying visitation to Plaintiff.  Indeed, it is well established that prison administrators may be named as defendants for claims seeking injunctive relief even where they had no personal involvement in the alleged wrongs. *See Megginson v. Caldwell*, 2015 WL 13229496, at *5 (D.N.J. Dec. 4, 2015) (holding that prison Warden may be a proper defendant to a claim seeking an injunction based on denial of necessary medical care despite his lack of personal involvement in unconstitutional conduct) (citing *Colwell v. Bannister*, 763 F.3d 1060, 1070 (9th Cir. 2014) ("[A] corrections department secretary and prison warden were proper defendants in a § 1983 case because '[a] plaintiff seeking injunctive relief against the State is not required to allege a named

**IT IS, THEREFORE**, on this 31st day of December 2024,

**ORDERED** that Defendants shall supplement their statement of material facts, their briefing, and the evidence as explained above within 30 days, send copies of their supplemental briefing and exhibits to Plaintiff at the address on file, and file a certificate of service on the docket; and it is further

**ORDERED** that Plaintiff may submit a supplemental response within 30 days of his receipt of the Defendants' supplemental briefing, statement of material facts, and exhibits; and it is further

**ORDERED** that the Clerk of the Court shall **ADMINISTRATIVELY TERMINATE** this matter and the motions for summary judgment pending at ECF Nos. 182-183 until the supplemental briefing is complete; and it is further

**ORDERED** that the Court retains jurisdiction over this case, and will reopen the matter for adjudication once the briefing is complete; and it is further

**ORDERED** that the Clerk of the Court shall send a copy of this Memorandum & Order to Plaintiff at the address on file.

_____
Hon. Madeline Cox Arleo, District Judge
United States District Court

---

official's personal involvement in the acts or omissions constituting the alleged constitutional violation. Rather, a plaintiff need only identify the law or policy challenged s a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief.'"); *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011) ("Though Gonzalez does not allege any specific involvement by Gaetz in the treatment of his hernia, the warden . . . is a proper defendant since Gonzalez seeks injunctive relief. . . . If Gonzalez was seeking only damages, the warden's lack of personal involvement would be conclusive, but since Gonzalez also seeks injunctive relief it is irrelevant whether the warden participated in the alleged violations.")); *Mitchell v. Jones*, 2022 WL 2657365, at *6 (W.D. Pa. Mar. 9, 2022) (collecting cases).